## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**3. GERMAN HERNANDEZ ESCOBAR,<br>a/k/a TERIBLE**<br><br>**Defendant.** | **Criminal No. 15-10338-FDS** |

### GOVERNMENT'S OPPOSITION TO
### DEFENDANT'S MOTION TO SUPPRESS AND MOTION TO DISMISS

The United States opposes the "MOTION TO SUPPRESS SHOWUP ID AND

MOTION TO DISMISS OR EXCLUDE EVIDENCE OF ALLEGED 2008

ATTEMPTED MURDER" filed by defendant German Hernandez Escobar a/k/a

Terible.  *See* Dkt. No. 1834.  Both lines of arguments in the combined motion are

unsupported by the law and this Court should **DENY** the Motion.

*First*, as to the show-up identification procedure, there was no due process

violation and courts have long upheld show-up identifications that take place

immediately after an offense has been committed because such identifications are

valid investigative steps that may be necessary to avoid the mistaken apprehension

of the wrong suspect.

*Second*, as to the motion to dismiss, the defendant is on trial for racketeering

conspiracy and the evidence of the alleged 2008 attempted murder is relevant and

admissible for a multitude of reasons relevant to the racketeering conspiracy even if

the incident does not qualify as a racketeering act.

I.      **FACTUAL BACKGROUND**

For purposes of the present motion, the relevant facts surrounding the show-up identification are not in dispute and are contained in two pages of narrative police reports attached as Exhibit A to Hernandez Escobar's motion.  Summarizing from those reports:

On December 7, 2008, Malden police responded to 106 Main Street where they encountered a 15-year-old victim who had been struck in the head with a baseball bat.  The victim told police that he was standing on Main Street by Appleton Street when a silver, two-door BMW pulled up next to him and two men asked him if he was a member of the Bloods gang (purportedly because he was wearing a red sweatshirt).  He said no and kept walking down Main Street to go get a haircut.  In the area of 90 Main Street, the same BMW pulled up next to him again.  The victim stated that a Hispanic man got out of the car with an aluminum baseball bat, made another reference to the Bloods, and then hit him in the head with the baseball bat.  The victim said that the driver of the car was also Hispanic. The victim said he got a good look at both men, described them, and said that he would be able to ID them again if he saw them.

While officers were interviewing the victim at the scene, Everett Police informed Malden Police that they had stopped a vehicle matching the description of the BMW, which was occupied by two Hispanic men that appeared to match the description of the suspects.  The victim was asked if he would participate in a show-up identification.  He agreed and Malden police accompanied him into Everett for the show-up identification.  When the victim saw the two suspects who had been

detained, he stated, "Yes, that's definitely them!"  He identified Hernandez Escobar as the man who struck him in the head with the baseball bat and stated that when he was struck, Hernandez was not wearing a hat and was wearing a grey hooded sweatshirt (instead of wearing a hat and a black hooded sweatshirt when stopped). Based on that identification, the police arrested Hernandez Escobar and co-defendant Santos Portillo Andrade.

After Malden police booked the suspects and advised them of their rights, both suspects made statements.  Portillo Andrade admitted to wearing a belt that said "BK," which he admitted stood for Blood Killer, and he further admitted to being a member of MS-13.  Hernandez Escobar denied being in MS-13 and claimed to have only known Portillo Andrade for a month.  Conversely, Portillo Andrade, in addition to admitting he was a member of MS-13, stated that he had known Hernandez Escobar since they were children and the two were like family.

## II.   <u>PROCEDURAL HISTORY</u>

Both Portillo Andrade and Hernandez Escobar were charged in state court for this 2008 attack.  Motion at p. 3.  Portillo Andrade pled guilty to assault and battery with a dangerous weapon.  *Id.*  Hernandez Escobar was deported prior to any resolution of the state case against him.  *Id.*

The Fifth Superseding Indictment charges both Portillo Andrade and Hernandez Escobar with racketeering conspiracy.  The Indictment lists this attack as one of the examples of the means and methods of the charged MS-13 conspiracy. *See* Indictment, ¶ 29(s).  Portillo Andrade pled guilty to the charges against him, including the racketeering conspiracy charge.  *See* Dkt. No. 1185.  In Portillo

Andrade's presentence report and as part of his plea, he admitted to this attack being in furtherance of the racketeering conspiracy.  Importantly, Portillo Andrade did not object to the descriptions of the relative roles of the two attackers, including that Hernandez Escobar was with Portillo Andrade and struck the victim in the head with the baseball bat.  *See* Portillo Andrade PSR at ¶¶ 24-29.[1]  Given the relative roles and culpability of the attackers, the government agreed that Portillo Andrade's conduct was better captured by the aggravated assault plus life-threatening bodily injury guideline (as opposed to the assault with intent to murder guideline), and the PSR concluded similarly.  *See id.*

---

[1]     Given Hernandez Escobar's argument in the instant motion that "Santos Portillo Andrade agrees that Mr. Hernandez-Escobar wasn't there when the assault took place and would so testify if subpoenaed for trial," the government filed a motion to release relevant paragraphs of the Portillo Andrade PSR to Hernandez Escobar, *see* Dkt. No. 1899, which the Court granted on February 13, 2018.

Portillo Andrade admitted to the PSR's description of the attack, including Hernandez Escobar's involvement.  In relevant part, his PSR states:

> PORTILLO ANDRADE pulled the BMW over next to [victim], and PORTILLO ANDRADE and HERNANDEZ yelled out to [victim], asking if he was a member of the Bloods.  [Victim], who was not a member of the Bloods, told them, "no," and continued walking down Main Street toward a barber shop.  A short distance from the barber shop, PORTILLO ANDRADE again pulled the BMW up next to [victim].  HERNANDEZ, wearing a grey sweatshirt, jumped out of the BMW with a baseball bat and confronted [victim], demanding to know whether he was a Blood.  [Victim] said that he was not, and HERNANDEZ hit Garcia over the head with the bat.

Hernandez Escobar is free to subpoena Portillo Andrade for trial and Portillo Andrade is free to testify that Hernandez Escobar was not the second assailant.  If Portillo Andrade testifies to that effect, the government can and will cross-examine him at that stage, but that possibility is no basis to dismiss or exclude evidence relating to this attack.

III.   **ARGUMENT**

   A. **The Court Should Deny the Motion to Suppress the Show-up Identification.**

The defendant's first argument—that "the show-up ID was unreliable and showed that the defendant was not the assailant"—is without merit.  The show-up ID was reliable and not in violation of any Constitutional right; further, an argument that the defendant may not be the assailant is an argument for the jury, not an argument to suppress the identification and keep evidence from the jury.

There was no due process violation in this case.  "Although introduction of impermissibly suggestive identification evidence may violate the Due Process Clause," the First Circuit has "stated repeatedly that identification evidence should be withheld from the jury only in extraordinary cases." *United States v. Rivera–Rivera*, 555 F.3d 277, 282 (1st Cir. 2009) (internal quotations and citations removed).  *See also United States v. Holliday,* 457 F.3d 121, 125 (1st Cir. 2006) (articulating same principle and finding no error in denial of motion to suppress); *United States v. Henderson,* 320 F.3d 92, 100 (1st Cir. 2003) (articulating same principle and holding that testimony was properly submitted to the jury); *United States v. Watson,* 76 F.3d 4, 6 (1st Cir. 1996) (articulating same principle and affirming denial of motion to suppress show-up identification).  As shown below, this is not one of those "extraordinary cases" where evidence "should be withheld from the jury."

The Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence,

but by affording the defendant means to persuade the jury that the evidence should be discounted." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).  To avoid "supplant[ing] the jury's ordinary function," courts apply a suppression test meant to screen out only "clearly unreasonable" identification evidence.  *United States v. Jones*, 689. F. 3d 12, 18 (1st Cir. 2012); *see also United States v. Arthur*, 764 F.3d 92, 99 (1st Cir. 2014).  The First Circuit has articulated a two-prong test for a District Court to determine whether a pre-trial identification should be suppressed:

> First, the court must determine whether the procedure was impermissibly suggestive.  If it so finds, it must decide whether the identification itself was reliable under the totality of the circumstances, notwithstanding the suggestive procedure.

*Watson*, 76 F.3d at 6; *see also Simmons v. United States*, 390 U.S. 377 (1968) (discussing similar principles).

Both prongs are fatal to the defendant's argument:  (1) the show-up identification was not impermissibly suggestive, and (2) even if the procedure was impermissibly suggestive—which it was not—the identification itself was reliable under the totality of the circumstances.

## 1.  The Show-up Identification Was Not Impermissibly Suggestive.

As an initial matter, the defendant bears the burden of demonstrating impermissible or unnecessary suggestiveness.  *See, e.g.*, *United States v. Lawrence*, 349 F.3d 109, 115 (3rd Cir. 2003); *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).  The defendant cannot make any such showing in this case.

The first prong of the test—whether the identification procedure was impermissibly suggestive—"can be broken down into two constituent parts: that

concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *Holliday*, 457 F.3d at 125. *See also Perry*, 565 U.S. at 238–39 (Due process concerns arise only when an identification procedure is "both suggestive *and unnecessary*.") (emphasis added).

Here, the show-up identification was neither suggestive nor unnecessary. Prior to the procedure, the victim said he got a good look at both attackers, described both attackers, and said that, if he saw them, he would be able to identify them again. Moreover, during the procedure, far from conforming his memory to the scene before him, the victim noted that the person who attacked him had been wearing a sweatshirt of a different color. These facts make it hard to conclude the show-up identification was suggestive at all, let alone impermissibly so. Put differently, the victim's statements both before and after the identification are inconsistent with conforming to impermissible police pressure or impermissibly suggestive procedures.

Further, challenges to show-up identifications routinely fail due process challenges because they are done with good reason, if not out of necessity. "Show-ups that take place immediately after the offense has been committed may be necessary in order to avoid the mistaken apprehension of the wrong person." *United States v. Watson,* 76 F.3d 4, 6 (1st Cir. 1996). *See also United States v. Bautista,* 23 F.3d 726, 730 (2d Cir. 1994) ("[W]here an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity."); *Johnson v. Dugger,* 817 F.2d

726, 729 (11th Cir. 1987) ("[I]mmediate confrontations allow identification before the suspect has altered his appearance and while the witness' memory is fresh, and permit the quick release of innocent persons."); *Frank v. Blackburn,* 605 F.2d 910, 912-13 (5th Cir. 1979) ("[A]n immediate confrontation not only prevents the suspect from substantially altering his appearance and allows the witness to test her recollection while her memory is still fresh, but permits "expeditious release of innocent subjects.").

The reasoning of those cases is especially applicable to the facts of this case. Here, police from the neighboring city of Everett stopped a vehicle matching the description soon after the attack in Malden.  It is only reasonable for Malden police to "have doubts whether a detained suspect is in fact the person sought," *see Bautista,* 23 F.3d at 730, and a show-up identification could have resulted in the "expeditious release of innocent subjects," *see Blackburn,* 605 F.2d at 913. Similarly, "immediate confrontations allow identification before the suspect has altered his appearance," *see Dugger,* 817 F.2d at 729, and here, it appears that the defendant already had time to change his attire slightly.  In sum, here, there can be no doubt that the police had "some good reason" to use the identification procedure the defendant is now challenging.  *See Holliday,* 457 F.3d at 125.

Hernandez Escobar's challenge to the show-up identification must fail because it cannot overcome the first prong of the suppression test:  it was *not* impermissibly suggestive and unnecessary.

8

### 2.  The Show-up Identification Was Not Unreliable.

The second prong is that, "notwithstanding the suggestive procedure"—and here, there was none—the identification must be so unreliable under the totality of the circumstances that "there was a very substantial likelihood of irreparable misidentification." *United States v. Rivera–Rivera*, 555 F.3d 277, 282 (1st Cir. 2009); *see also Henderson*, 320 F.3d at 100.

In the seminal case of *Neil v. Biggers*, 409 U.S. 188, 196 (1972), the Supreme Court outlined five factors that can help determine whether a pretrial confrontation "was so suggestive and conductive to irreparable mistaken identification that the defendant was denied due process of law."  The five *Biggers* factors are as follows:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

*United States v. de Jesus-Rios*, 990 F.2d 672, 677 (1st Cir. 1993) (citing *Biggers*, 409 U.S. at 199– 200).  No single factor is dispositive and the district court should examine the totality of the circumstances.  *See id.*

Here, each of the *Biggers* factors suggest that the victim's identification of Hernandez Escobar was reliable:

*First*, there was ample "opportunity for the witness to view criminal at the time of the crime."  *Id.*  The victim saw the defendant twice, both times in the light of day.  The assailants' car first pulled up beside the victim close enough for them to have a brief conversation with the victim, and second, the defendant was necessarily within arm's reach when he swung a bat at the victim's head.

*Second*, given that the victim told the police that he had gotten a good look at his assailants and could identify them, the "witness' degree of attention" hardly favors defendant's argument.  The victim was able to describe the car of the assailants, the assailants themselves, and the bat used to attack him.

*Third*, "the accuracy of the witness' prior description of the criminal" does not support defendant's argument.  The victim's prior descriptions were accurate.  The car stopped by Everett police matched the description; the bat found in that car matched the description; the driver matched the description; and the attacker matched the physical description of the assailant.  The one difference was that the assailant wore no hat and a grey sweatshirt, whereas by the time of the identification, the defendant was wearing a black sweatshirt and hat.  The defendant cites this difference as proof that the identification procedure was "in fact unreliable."  Motion at p. 4.  That minor difference can be easily explained by the defendant changing sweatshirts or putting on a hat in the car, or by a minor fault in the victim's description or perception of a grey vs. a black sweatshirt.  In any event, the fourth factor makes this a non-issue.

*Fourth*, as to "the level of certainty demonstrated by the witness at the confrontation," the victim saw the two individuals stopped by police and said, "Yes, that's definitely them!"

*Fifth*, the "the length of time between the crime and the confrontation" further weighs against exclusion of the identification.  Here, police officers were still interviewing the victim at the scene when the car was stopped and the victim was taken to identify the suspects.

10

Given the totality of circumstances, there is nothing to suggest that this is the "extraordinary case" warranting suppression because the show-up identification "was so suggestive and conductive to irreparable mistaken identification that the defendant was denied due process of law." *Biggers*, 409 U.S. at 196 (1972). Accordingly, even if the show-up identification were impermissibly suggestive in the first instance, which it was not, there was no due process violation and suppression of the identification would be improper.

### 3. The Law Cited by Defendant Does Not Support Suppression.

Finally, none of the cases cited by the defendant, including the numerous Supreme Court cases, warrant a different conclusion.  Indeed, in none of those cases did the Supreme Court actually suppress the challenged identification.  *See Perry*, 565 U.S. at 245 (affirming denial of motion to suppress out-of-court identification because, without taint by "improper state conduct," identification evidence was for the jury to assess); *Biggers*, 409 U.S. at 201 (reversing in part and overturning the suppression of a show-up identification because the identification was reliable); *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (reversing grant of writ of habeas corpus because even though the identification procedure was *both* unnecessary *and* suggestive, given an analysis of the *Biggers* factors, "there did *not* exist a substantial likelihood of irreparable misidentification under the totality of the circumstances); *Simmons v. United States,* 390 U.S. 377, 384 (1968) (finding no due process violation because the identification procedure was reliable); *Stovall v. Denno*, 388 U.S. 293 (1967) (finding no due process violation because the challenged identification procedure was necessary and imperative given timing of the attack).

11

As for applicable Court of Appeals guidance, the only First Circuit case cited was *Moore v. Dickhaut*, 842 F.3d 97, 102 (1st Cir. 2016), but that does not help defendant either.  In that case, the First Circuit *affirmed* this Court's *denial* of a habeas petition.  *See id.* (affirming *Moore v. Dickhaut*, 2014 WL 949597, * 3 (D. Mass. Mar. 10, 2014) (Saylor, J.)).  At the District Court level, the court had correctly cited *Biggers* and found that the state court's determination that the challenged identification procedure was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" was "a reasonable application of, and not contrary to, clearly established federal law." *Dickhaut*, 2014 WL 949597, at * 3.  The First Circuit then cited *Biggers*, *Perry*, *Simmons*, *Brathwaite*, and *Stovall* in affirming the District Court's denial.

This Court should apply *Biggers* and its progeny to the facts of this case. Such application warrants a finding that there was no due process violation and the Court should **DENY** the defendant's motion to suppress the show-up identification.

### B. **The Court Should Deny the Motion to Dismiss or Exclude.**

The defendant's second argument—that "the allegations of attempted murder should be dismissed or evidence excluded"—is similarly unavailing for a variety of reasons.

*First*, there is nothing to "dismiss" vis-à-vis the 2008 attempted murder because Hernandez Escobar is not charged with the 2008 attempted murder—he is charged with RICO conspiracy.  The government has not charged and need to prove a stand-alone attempted murder.

12

*Second*, the defendant's argument about estoppel is meritless.  The defendant

argues as follows:

> The government is estopped by its representations in the Portillo-
> Andrade plea agreement from contending that the 2008 events
> constituted attempted murder by Mr. Hernandez-Escobar. In the
> Portillo-Andrade plea agreement, the government specifically agreed
> that the 2008 events constituted aggravated assault with a guidelines
> offense level of 19, not attempted murder which unlike assault is a
> predicate RICO act and has a guidelines offense level of 33.  Therefore,
> those allegations should be dismissed or alternatively any evidence of
> those events excluded from the upcoming RICO trial against Mr.
> Hernandez-Escobar.

Motion at p. 4.  Hernandez Escobar has provided no support for why guideline

calculations in one defendant's plea agreement are factually and legally binding

during the trial of a co-defendant.  Further, the argument falls apart when taken to

its logical conclusion.  Hernandez Escobar argues that because Portillo Andrade's

guideline calculation was for aggravated assault and not attempted murder,

Hernandez Escobar should similarly be tagged with aggravated assault; he then

argues that because aggravated assault is not a RICO predicate, this incident

should be excluded at Hernandez Escobar's trial.  One obvious question arises: if

aggravated assault is not a RICO predicate, how was it lawful for this Court to hold

Portillo Andrade responsible for aggravated assault as part of his plea on the RICO

conspiracy charge?  The answer, of course, is that guideline calculations are not the

same thing as the substantive law on RICO conspiracy.

*Third*, and perhaps most importantly, the evidence of this 2008 attack is

relevant for numerous other reasons besides simply being evidence of racketeering

activity.  For example, this evidence may be relevant to showing that Hernandez

Escobar (or co-defendant Portillo Andrade) was a member of MS-13; it may be relevant to showing the association-in-fact between Hernandez Escobar and Portillo Andrade; it may be relevant to showing the MS-13 enterprise; it may be relevant to showing that MS-13 members attack rival gang members; or it may be relevant to a host of other issues separate and apart from whether the 2008 attack technically qualifies as a racketeering act.

*Fourth*, and relatedly, the Court has rejected similar arguments in this very case. For example, during the first trial, Rafael Leoner Aguirre made similar arguments seeking to exclude evidence of certain acts he claimed did not constitute racketeering activity, and Edwin Guzman made similar arguments in the ongoing trial seeking to exclude evidence of old attempted murders.

*Finally*, the he defendant makes a conclusory and meritless argument that the show-up identification "confirms that the defendant was not the assailant" and it is therefore "a waste of time and government resources to litigate this matter." *See* Motion at p. 5. *Id.* The show-up identification does no such thing, although the defendant is free to suggest otherwise to the jury.

At bottom, there is no basis to dismiss or exclude all evidence of an alleged attempted murder committed by the defendant and his co-conspirator in 2008. There is no requirement to prove specific racketeering acts; even if there were, this attack would qualify as a racketeering act; even if it did not qualify as a racketeering act, the evidence related to this attack is admissible for a variety of other purposes. This Court should **<u>DENY</u>** the defendant's motion to dismiss and/or suppress all evidence of the 2008 attempted murder.

14

IV.     **<u>CONCLUSION</u>**

For the reasons above, the Court should **<u>DENY</u>** the defendant's "MOTION

TO SUPPRESS SHOWUP ID AND MOTION TO DISMISS OR EXCLUDE

EVIDENCE OF ALLEGED 2008 ATTEMPTED MURDER," *see* Dkt. No. 1834.

> Respectfully submitted,
>
> ANDREW E. LELLING
> United States Attorney

By:     <u>/s/ Kunal Pasricha</u>

> KUNAL PASRICHA
> GLENN A. MACKINLAY
> CHRISTOPHER POHL
> KELLY LAWRENCE
> Assistant United States Attorneys

15

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic

Filing.

By:     /s/ Kunal Pasricha
        KUNAL PASRICHA
        Assistant United States Attorney

Date: February 14, 2018